Good morning, Your Honors. My name is Thomas Frankovich. I represent Dreece the Appellant. The underlying tenet of this case is inclusion versus segregation. And I think in order to cast it properly, we need to look at the fact that there is the craftsman home and there is the gazebo. And as we stand here today, or as I stand here today, the tour bus comes in with 100 people, four of those being disabled, one of those being in a manual chair, one in a powered chair, one using a walker, one using Canadian crutches, and another individual with a cane. As I stand here today, those five individuals with disabilities would not have the ability to go into the craftsman-style house and have the opportunity of the same stairs. The crux of this case is whether Foley Estates should provide access to this craftsman home. During the course of litigation, it got an historical designation. It's been the appellant's position that we met our burden of showing at least three alternatives on how it could be ramped going into the back of the craftsman house. Those three alternatives, they were done with drawings, an expert on access, and then followed by a construction expert as to what the cost would be to do that. So we believe that we met our burden in terms of what, how access could be provided. We believe that the district court erred in not requiring that the appellee follow CFR 36405 and ADAG 4.1.7, which in essence states that if you have an historic building and if there becomes a question as to whether the removal of barriers will affect the historical significance, then you go to the state historic preservation officer and discuss that and have a determination made as to whether in fact it would. If in fact it would affect the historical significance, then it would be determined that it would not be readily achievable. If the court looks at the record and looks at the photographs of the gazebo, which is built I believe sometime in 1980 for the House on the Prairie, and it's right next to this craftsman style house, even though they had testimony by Dr. Post that that somehow fits in, when you look at the photographs of the craftsman style house, when you look at what was proposed by the appellant, the three different procedures, it would only be logical that they would, if they were going to say that they think it will affect the craftsman style, the historic preservation, that they go to the state historic preservation officer, an independent party, rather than what the district court allowed, allowing an expert to come in to testify basically without foundation that it would destroy the historic significance. We could hire an expert too and have an expert come and say, well, it won't destroy the historic significance. I also contend that common sense, if you look at the drawings, how can a ramp that runs along the grass and goes all the way around and the only thing that protrudes is a handrail, how does that destroy the historic significance of the craftsman style house? Further, the evidence shows that on the north side of the craftsman style house, it's not craftsman style. Somebody in the kitchen area, it's in the photographs, remodeled it at some point and put aluminum windows in. So there was a change there. So anyway, our position is simply that the district court did not. The craftsman style houses can't have aluminum windows? They didn't. They didn't have ramps either, did they? No, they didn't, but the ramp is at the level of the foundation, goes up and around. If you go to some of the memorials that are in Washington, D.C., they didn't have lifts that bring you up to the level of entrance in some of the historical sites in Washington. Now, turning to another issue, and that's the fact that the district court... Well, I don't know a lot about craftsman homes, but it seems that there are lots of them around and I see a lot of old homes around Los Angeles and here and they're designated as craftsmen. Correct. Jimmy Carter lived in a craftsman home. They bought it at Sears and Roebuck, delivered by train. Well, I can't dispute the fact that Foley Estates got a historic designation and they got it. I mean, in some counties and cities, you take Marin and they're back on the same thing. Some of those houses were built after World War II that they want to maintain that architectural integrity and not let people make changes to some of those old homes that are out at Hamilton Field. Now, coming back to the other issue that the court ordered barrier removal within the craftsman style house, and that goes to the rear door, making the rear entry accessible, putting in offset hinges, lowering the counter. The argument that's made by Pele in the cross appeals, that shouldn't have been done because the access that exists at the time is a rear ramp that goes from 6% to 20% and that's the ramp that Mr. Molsky initially used. And we're of the position that that ramp still should be able to be used because, as I indicated in my example, maybe a person in a manual chair would have difficulty. Mr. Molsky was able to do it, although he had stress and strain in so doing it. But a power chair user could certainly do it. A person using a walker will generally take any type of a ramp over trying to do steps. The same with a person using Canadian crutches or a person using a cane. So that is an alternative. And, you know, as we sit here today, or stand here today, Foley Estate still has a continuing duty to provide access. And the alternative is not the gazebo because the gazebo segregates people from the experience of the wine tasting within this craftsman style home. And further, the argument that, well, we built a new winery 15 miles away and you can drive there. Well, in my, you know, my example, well, I guess they just have to wait for the tour bus to go there and not participate at this Foley Estates. Well, does Section 36304D2 apply here where it says, no measure shall be taken that poses a significant risk to the health or safety of individuals with disabilities or others if you have non-powered wheelchairs? Does it pose a significant health risk to persons who have wheelchairs that are manually operated? Well, there's no evidence that it does. I mean, in our pleading it indicated that Mr. Moleskine could help up that ramped area. So, argumentatively, you could say a person such as Mr. Moleskine, a manual chair, might have a problem, but that wouldn't preclude the others, such as a power chair, Canadian crutchers, walker, from being able to do that. I guess the question is how many people have to be precluded? Well, I think if you just preclude by virtue of what the ADA says, it could just be an individual, but I don't think that's realistic to say that only one or two or three or four individuals. What we have here, those that would be precluded are those that have ambulatory problems because they cannot get into the Craftsman Style house up the stairs. They have to use a ramp of some sort or a lift. Have ambulatory what? Those that have ambulatory problems. Problems, oh, okay. Such as a person using Canadian crutches. So, personally, if we take like the Canadian crutch scenario, they could attempt to go up the stairs. That would be much more dangerous than trying to go up a cement ramp. And it's not 20% in all places. Some places it goes 20%, some places it's 6%. So, a person with Canadian crutches, let's say cerebral palsy, depending upon the nature and extent of the cerebral palsy, when they do go in through the rear door, the rear doors have now been made wider. And it's not just wider just for people that use wheelchairs, but, you know, the Department of Justice, when they implemented, you know, the CFR, made a determination that doors, for instance, will have 32 inches of clear space. Well, do you agree that CFR 36405 and ADAAG 4.17 do apply in this case? Do apply. And if it didn't apply, that means that any defendant that has an historically designated public accommodation under the way this case was decided could simply get an expert to say that it impacts the historic designation and, therefore, it's not readily achievable. I mean, there's literally no check and balance. The other thing I should point out to the court, because it comes up over and over again, where the attempt to put the burden, you know, if you look at Colorado Crossroads and the dissent about do you have a plan that will be approved by the city of Denver, there is no jurisdiction in the state of California where I can go in not being the property owner and not being the architect and hand them a set of plans and find out whether they'll approve it or not. It's only the owner that can do it or the architect that can do it. So if we have that hurdle, we could never do any of these cases that would require putting on evidence, other than speculative evidence, of what a public agency would do, what a building official would do, because they won't do it. But that was the dissent. Pardon me? That was the dissent. The majority sort of... You have an opportunity to say we agree with the dissent. It's a theory in its entirety. All right. All right. I'll save my seven minutes and 50 seconds. Okay. Thank you. Good morning to the justices. I'm Barry Snyder, representing Foley Estates. We are the respondent and cross-appellant in this matter. Let me first offer an apology to the court. I didn't see the forest for the trees, and after reading an article by Justice Pregerson, I realized I had not focused in on the standard of review argument here. And I want to take a moment and talk to the justices about that if I can. We believe that the standard of review with respect to the appellant in this case, because this matter went to a trial with a trial decision, is whether or not there is substantial evidence to support the trial court with respect to the issues that are on appeal. With respect to the issues that are raised by my client, Foley Estates, on the cross-appeal, the issue is whether or not there was plain error by the trial judge in ordering those interior accommodations or injunctive relief. So with that, let me talk a bit, if I can, about what I believe to be one of the critical facts in this case that perhaps was overlooked by my opposing counsel here in his argument. There was a key finding by this trial court that Foley had met its obligations, its legal obligations, to provide its goods and services in an alternative fashion at the gazebo. Now, why is that important? That's important because everything save the ability to be inside this craftsman house and enjoy what counsel would say to be the ambience of this particular craftsman home was provided by law by Foley well in advance of this particular lawsuit being filed. But is that really the question? Isn't the question whether the barrier removal for the interior is readily achievable? It's kind of a two-step process, Justice Nelson. I hate to interrupt, but there's a famous saying, there ain't no justice in the Ninth Circuit. We are called judges, in contrast to the state courts where the Court of Appeals judges are called justices. So I can understand your confusion. We get confused about it, too, but we're just plain old judges. Well, maybe I'll try and get some justice from the judges here, Judge Nelson. It's a two-step situation here. Whether or not the barriers are readily achievable, barrier removal is readily achievable, also falls in with this idea of making the goods and services available in another method. Now, in this case, the trial court found that because of the historic nature of this property, the barriers were not removable in a readily achievable fashion. That being so, the court then found that irrespective of that, all of the goods and services that my client offers were immediately available and accessible to ADA people in the gazebo area. So they could enjoy the same goods, the same services, and the same experience in terms of wine tasting. And that's just a few feet from the Craftsman home here. But perhaps by themselves, when everybody else is inside. Well, maybe by themselves, but I think that our common knowledge leads us to believe that nobody is going to be left alone. The big tour bus comes up, and of course these people in wheelchairs will be accompanied by someone else, and they will have friends and other acquaintances that will participate with them. They're not going to be left alone. We know that in society. Remember, they want to go into the Craftsman. You know, I'd love to go to a, yeah, I'd like to get into the Craftsman home, too. But the problem is, is that if you build a ramp that allows that to occur, then you're going to totally impede the historical significance of this particular Craftsman home. And the trial court found, I think, accurately so, that that simply makes that barrier removal not appropriate in this case. And if you then have the only available access for wheelchairs by way of a 6 to 20 degree ramp up to the back, where Mr. Molski, in his verified complaint, I believe it was verified, said that he was injured in his own wheelchair. If we can only attempt to use that ramp, why do we need to make interior changes to the cottage to allow wheelchair movement through the cottage, if all we're doing is encouraging wheelchair people to use that ramp, that dangerous ramp, to get to the Craftsman cottage? Questions? Answering the question. Answering the question. Well, I can't answer that one for you. All I want to do is make the point that in this instance, this is not what we consider to be a voluntary alteration, such as if the defendant in this case intended to make changes to the cottage wholesale. It would have to go to the historic individual at the state and make those proposed changes and get those approved in advance. Here, what we're dealing with is something, and as I recall, it was either 405 or the other section that the judge read, talks about whether or not these should, as opposed to shall, be changed. In this case, it was simply advisory as opposed to mandatory, and I think that's a critical distinction here also. So what was the timing on getting the historical designation? The lawsuit was filed, and the historical designation was filed after that, or the application was made after that. Yeah, I think you're right. It's not hard to figure out. No, I don't think so. I mean, but the historical designation certainly would not have been granted had there not been a good reason for it to be granted. So irrespective of the timing, it would have been, and it was appropriate for the historical designation to be granted. I don't know whether it's hard to get or not hard to get. You see a lot of historical buildings with that designation in town, and you wonder about it. But the law generally requires, if you're in a business, the business your client is in is to make your facilities so they're available to handicapped people. And they like to be treated like anyone else, even though they're handicapped. Of course they do. There ought to be a way to accommodate that. Well, in some cases there is a way. Aren't you going to lose business if you don't do that? Are these tour buses going to come by? That's the main source of your business, isn't it, tour buses? Probably tour buses and people simply going on wine tasting, of course. And you're absolutely correct, Judge Pregerson, about that, is that if we could do it, we would do it and should do it. That's why the law is in effect. But you look at situations such as the Speckner v. Nation's Bank matter, where there was literally no access to the banking hall in that historic building, and it simply could not be accomplished. This is one of those situations, without significantly impairing the historical significance of Nation's Bank, or without significantly impairing... What would you have to do to remove those barriers? The barriers at our winery? Yeah. Well, according to the evidence in this case, we would have to... What do you think that your client ought to do to remove those barriers? I think my client has done everything that it is required to do under the law to remove those barriers. Let me ask you that question. Say you wanted to remove the barrier, what do you think the best way to remove it would be? If we were not giving any deference whatsoever to the historical significance, it would be to install a ramp, much in the fashion that the plaintiffs claim should be installed at a cost of $2,000. But the only evidence in this case, from the only expert in this case, was that installation of that ramp would significantly affect the historical significance of this structure. Well, couldn't you get a piece of equipment that would be like a portable little elevator that would lift people up? I suppose that anything is possible, Your Honor. We have them in our courthouse over here. Of course, and we have those in many of our courtrooms for people at the witness stand. I suppose anything is possible, but given the confines... That wouldn't destroy the historical significance of the building. That was not any of the evidence in this case, and nothing upon which the trial court relied, as I recall. Well, let me ask you this question. Doesn't 36-304 expressly contemplate the provision of a steeper ramp where full compliance is not readily available? 36-304 specifically allows, as I read it, for a steeper ramp. And Section 304d-2 states, no measure shall be taken, however that affect the health and safety of individuals. And that was the purpose of my question to opposing counsel. Of course, and I understood that. And that was your argument, and it doesn't appear that it would do that. So my question is, doesn't 304 expressly contemplate the provision of a steeper ramp where full compliance is not readily achievable? Well, yes, it certainly could contemplate a steeper ramp where full compliance isn't achievable. But in this case, we know from the only evidence that the steeper ramp in this case, the 6 to 20-degree ramp, caused injury to the only person that we know ever attempted to climb that ramp. And if we have instructions in the ADA that say we are not supposed to do anything that potentially will injure people, why do we have this ramp? Why do we encourage this ramp to be used? Let's push them up the ramp. Well, sure, I guess we could. Then we're going to have to have probably some sort of a device at the bottom of the ramp that would alert people in the winery that somebody needs assistance. We'll have to go down, find them, push them up the ramp. That's certainly possible. I mean, for instance, in the Gaithwright versus Fox Theater case, they had people assisting some of the wheelchair occupants there. But those wheelchair occupants in that case found that they weren't being assisted in the way that they wanted to be assisted. So we always run into problems there. Very difficult part of the law to deal with, especially for commercial businesses. Well, you have to do these things. Absolutely, and we do. In our society, we've committed to take care of handicapped people. And you can't use all these different dodges. You're exactly right, Judge. We're supposed to have somebody out there, we have to push a button, have to do this and that. A bus comes in, you're there, aren't you, to greet them? We would hope that we would be there, yes. Come on, have wine, try it, buy it, and all that. Well, as the court is aware, before this lawsuit was even instituted, Foley had hired an attorney to come on the property and give them some instructions as to what they needed to do to become ADA compliant. And they began taking those steps and were in the process of completing those at the time Mr. Molsky came on the premises. So this is not a situation where my client was sitting back idly waiting for the first lawsuit to happen. What did this lawyer tell you to do? They told us to make some changes in terms of the parking lot, to assure that the gazebo was available and that goods and services were made available. He gave you the advice about the gazebo? She actually did, yes. She did. Okay. Well, anything else? I don't think so. I've got three minutes, if I can reserve that for anything. No, this is your chance. Okay, well, that was my chance. Thank you very much, Your Honors. I think we've heard enough on this, haven't we? What are you going to tell us? I want to answer that question that you posed to counsel about what could they do. I can figure that out. Oh, sure. I don't want you to leave here unhappy. During the course of the trial, we had the three alternatives that we felt were going to be workable and not cost much money  There's a fourth alternative during the course of the trial that we weren't prepared for. We have this discussion of that rear service ramp, the 26%. The answer to taking care of all of this today, which is outside of the record, is the fact that they could ramp in the back all the way to the rear entrance, which is now accessible, using the common switchbacks that you see. The idea is to maintain an 8.33% and to be completely ADAG compliant. That's what we talk about later, I guess. Switchback ramp. It starts up at 8.33, and because it's steep, then it levels out, and then it goes back up at 8.33, and then it levels out, and then it goes back up at 8.33 or something less, and you go in. It's just tiered switchbacks. You see them all the time. And then every time you make a switchback, you get a glass of wine. You have to make it easy to come back. I'm a salesman. I had a couple other comments, but I guess you're free to go ahead. Thanks. Thank you. All right. Let's see. Next matter is Lois Fordlock versus Commissioner of Internal Revenue.
judges: Pregerson, Nelson, Fernandez